Richard L. Malter and Phyllis Malter v. Commissioner.
Malter v. Commissioner
Docket No. 5333-65.
United States Tax Court
T.C. Memo 1967-96; 1967 Tax Ct. Memo LEXIS 162; 26 T.C.M. (CCH) 459; T.C.M. (RIA) 67096; May 5, 1967
*162 Richard L. Malter, pro se, 620 Reiss Pl., New York, N. Y. Jay S. Hamelburg, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1963 in the amount of $1,364.31 and an addition to tax under the provisions of section 6653(a) of the Internal Revenue Code of 1954 in the amount of $68.22. The issues for decision are: (1) Whether one of petitioners received tips as a bartender in 1963 which were not reported by petitioners on their income tax return and if so the amount of such tips received. (2) Whether petitioners are entitled to a deduction for a loss in connection with one of petitioner's operations under the name of Malter Arms Co. (3) Whether petitioners are liable for addition to tax under section 6653(a) of the Internal Revenue Code of 1954. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided at the time the petition in this case was filed in New York, New York, filed a joint Federal income tax return for the calendar *163 year 1963 with the district director of internal revenue, Brooklyn, New York. Richard L. Malter (hereinafter referred to as petitioner) worked during the year 1963 as a bartender and received wages from the employers listed and had Federal income tax withheld from such wages in the amounts as follows: Total
Tax
Employer
Wages
Withheld
Harry M. Stevens, Inc.
$1,090.81
$162.15
Harry M. Stevens, Inc.
65.00
8.65
Stork Restaurant, Inc.
840.00
123.38
The Plaza Hotel, Inc.
693.68
83.50
Hotel Americana of New
York, Inc.
651.94
55.41
Hotel Roosevelt Corp.
129.85
16.00
Rock-Hill UNS. Inc. - New
York Hilton
63.80
4.46
Essex House Hotel, Inc.
52.51
2.50
Towers Hotel Investors
Corp.
21.40
78013 Corporation T-A Ho-
tel Commodore
10.53
1.30
$3,619.52
$457.35
The wages received by petitioner from Rock-Hill UNS. Inc. - New York Hilton, Essex House Hotel, Inc., and Towers Hotel Investors Corp., were for services as a banquet bartender. The tips he received for his services as a banquet bartender for these employers were included in the total wages he received from these employers as set forth above. Petitioner was employed by Stork *164 Restaurant, Inc., The Plaza Hotel Inc., Hotel Americana of New York, Inc., Hotel Roosevelt Corp., and 78013 Corporation T-A Hotel Commodore as a service or banquet bartender. Petitioner's work for Stork Restaurant, Inc. (the Stork Club), was on a part-time basis for approximately the last 10 weeks of 1963 and the early part of 1964. He received $80 a week salary which was $20 more than the amount received by the front or public bartenders. Petitioner was the only service bartender at the Stork Club when he worked there. At that time there were three bartenders at the Stork Club serving the public. Under union agreements with various hotels, it is customary for a service bartender to receive more than a front or public bartender since the public bartender waits on the public and is in a position to receive tips from the public. Under these contracts the wages of a public bartender are about twice the wages of a waiter and the wages of a service bartender about two and one-half times the wages of a waiter. The service bars at which petitioner worked were in the kitchen or a room near the kitchen out of public view. Harry M. Stevens, Inc., is the name of the corporation which operates *165 the bars and restaurants at the New York Coliseum during the time various shows are held at the Coliseum. The bartenders who work at the public or "cash" bars at the Coliseum receive tips from the public. At the time of the trial of this case, it was the practice of the public bartenders who worked at the Coliseum during the various shows to each put in a certain amount a day for the service bartenders who received no tips from other sources. The amount which the bartenders working at the cash bars set aside for the service bartenders depended on the particular show and the amount of tips received by the public bartenders. If there were two service bartenders, the amount that the waiters each put in would be split between the two service bartenders. For the shows producing the highest amount of tips to the cash bartenders, each of approximately 11 such bartenders would put $2 per day in a "kitty" to be split between two service bartenders. For shows producing less tips for the public bartenders, a less amount per day would be put in the "kitty" by fewer public bartenders. During part of the year 1963 petitioner was unemployed and received unemployment compensation except when he *166 would be assigned work from the unemployment compensation office with which he was registered. During the year 1963 a cash bartender working at the Coliseum was paid approximately $14.50 a day wages and a service bartender approximately $16.50 a day wages. The wages at the Coliseum were lower than the wages at the Hotel Americana where petitioner was employed as a service bartender on a regular basis from the beginning of 1963 through approximately the middle of March 1963. Petitioner's work at the Hotel Americana began in the evening and for part of the time he was working at the Coliseum, he would work both at the Hotel Americana and at the Coliseum. However, on some occasions he reported to the Hotel Americana that he was ill, but actually worked on that day at the Coliseum. He was discharged by the Hotel Americana when the fact that he had reported as sick to the Hotel Americana and actually worked at the Coliseum was discovered by his superiors at the Hotel Americana. During the year 1963, petitioner worked some part of 58 separate days at the Coliseum as a cash bartender. He worked 12 days in January as a cash bartender at the Coliseum during the Motor Boat Show. He was *167 in the second bartender's position at one of the cash bars and therefore not in a position to take in as much cash or receive as much in tips as the first bartender. In March of 1963 petitioner worked in this same position for 1 day during the National Lighting Show, and in the latter part of March worked for 4 days in the same position during the Institute of Electrical Engineers' Exposition. In April petitioner worked for 9 days as a second bartender at one of the cash bars at the Coliseum during the International Auto Show. In the latter part of September and the early part of October, he worked for 4 days as the second bartender on a cash bar at the Coliseum during the National Hardware Show, and in the latter part of October and the first part of November worked for 4 days as a second bartender on a cash bar during a Business Equipment Exposition. In November 1963 petitioner worked in the second position on a cash bar during the National Hotel Show for 4 days, and in December he worked in this same position for 4 days during the Exposition of Chemical Industries. Generally, a cash bartender will receive from 10 to 15 percent of his cash sales in tips at the Motor Boat Show at *168 the Coliseum, approximately 10 percent of his cash sales in tips at the Institute of Electrical Engineers' Exposition and the Business Equipment Exposition, 5 to 10 percent at the International Auto Show, and around 7 1/2 percent at the Exposition of Chemical Industries. The total receipts at the cash bar at which petitioner worked at the Motor Boat Show were $10,125.80 for the 12 days petitioner was assigned to that bar. The total cash receipts on the day petitioner worked at the National Lighting Show were $493.80 at the bar to which he was assigned. The cash receipts for the 4 days that petitioner worked at the Institute of Electrical Engineers' Exposition were $3,917.95 at the bar to which petitioner was assigned. For the 9 days petitioner worked at the International Auto Show, the total cash receipts of the bar to which he was assigned were $3,945.70, and the total cash receipts for each of the 4-day periods for the bar at which petitioner worked at the National Hardware Show, the Business Equipment Exposition, the National Hotel Show, and the Exposition of Chemical Industries were $1,709.05, $2,709.00, $3,106.75, and $1,339.85, respectively. The bar at the Motor Boat Show would *169 generally remain open for 12 hours, although one bartender would work for only 8 hours. Generally, the bartender who worked in the No. 2 place would report for work early in the morning to open the bar, would have an hour for lunch, and would leave 9 hours after his arrival. Usually relief bartenders would come on to help in the evening with the bartender who worked in the No. 1 place who would report later and stay on generally through the evening. Bar sales and tips are generally not as high in the morning hours as later in the day. At the time that two bartenders are working on a single bar, the bartender in the No. 1 place will generally take in approximately 60 percent of the total cash receipts and the bartender working in the No. 2 place 40 percent, although depending on the personality of the bartenders this may vary. For 4 days during the National Auto Accessories Show at the Coliseum and 1 day during the Sports Show, petitioner worked as the sole bartender at one of the cash bars in the Coliseum, except for the relief time he had at lunch and the first hour or last hour the bar was open. During the 4 days petitioner worked on the bar at the National Auto Accessories Show *170 a total of $630.65 was received in cash at that bar, and on the 1 day he worked at the Sports Show $218.10 was taken in by both petitioner and his relief bartender. At the Heating and Air Conditioning Show, Home Modernization and Improvement Show, and Design Engineering Show, petitioner worked as the No. 1 bartender on one of the cash bars at the Coliseum for 4, 3, and 4 days, respectively, and the total amounts taken in by each of the bars during the days petitioner was working there were $2,072.35, $1,743.05, and $1,100.10, respectively. Generally, a cash bartender at the National Auto Accessories Show and the Heating and Air Conditioning Show will receive in tips approximately 10 percent of the cash he takes in, at the Sports Show approximately 5 percent, and at the Design Engineering Show approximately 7 1/2 percent. At shows other than the Motor Boat Show, the bars on some occasions would stay open for 10 hours and a relief bartender would take over for a bartender on a one-man bar or the No. 2 bartender on a two-man bar for 1 hour in the morning or evening, as well as the lunch hour. On December 7, 1961, petitioner filed with the State of New York a Business Certificate stating *171 that he was conducting or transacting business under the name of Malter Arms Co. At that time or shortly thereafter, petitioner was working on a husk bullet with respect to which he had hoped to obtain a patent. He had engaged the services of certain patent lawyers in an effort to obtain a patent. In 1963 it became apparent that no patent would be received with respect to petitioner's claimed invention. Petitioner had a disagreement with the attorneys with respect to the amount to be paid to them for the services they had performed in attempting unsuccessfully to obtain a patent on the husk bullet, and in 1963 he settled this disagreement with them by payment of $537.37 in addition to any amount previously paid to them. Petitioner engaged the services of another law firm to adjust the fee with the firm that had represented him in attempting to obtain the patent on the husk-type bullet, and in 1963 paid this second law firm $50 in addition to an amount previously paid to that firm for effecting the settlement with the first law firm. In 1962 a third law firm filed on petitioner's behalf an application for a patent for a firearm muzzle attachment and projectile with expansible, detachable *172 husk. This application was filed on January 10, 1962, and on June 30, 1964, petitioner received patent No. 3,138,991 covering the invention. By 1963, it had become apparent that the invention covered by the application for this patent was not practical and the patent, if obtained, would be worthless. In 1963 petitioner paid the amount of $240.30 to the lawyers who had filed the application for the patent. Petitioner at the time he commenced working toward the manufacture of the husk-type bullets and working on the patents for which applications were filed, expected to use the patents in the manufacture of bullets. He had advertised the bullets in magazines, stating in certain advertisements that patents were pending. He received prior to and during the early part of 1963 orders for the bullets which he filled by making the bullets almost by hand in the apartment which he also used as the home for himself, his wife, and his 2-year-old daughter. Petitioner after the year 1963 began to make a type of pellet which he offered for sale under the name of Malter Arms Co. Petitioner had a mailing address other than his apartment but any work in connection with the manufacture of the bullets *173 or pellets was done in his apartment. During the year 1963 petitioner paid $961.83 to Ocean Parkway Realty Company for the rental of the living room, bedroom, kitchen, and bath apartment in which he and his family lived. In addition to the payments made by petitioner in 1963 to attorneys and for rental of his apartment, he paid $20 to B. S. Davis for the use of a mailing address, $95.30 for telephone service in his apartment, and $103.29 for electricity. During 1963 petitioner also paid union dues of $49.50 to the Cafeteria Employees Local Union 302 and $13.50 to the Hotel and Club Employees Union Local 6. In 1963, petitioner also paid $13.20 to Morgan Guaranty Safe Deposit Company for a safety deposit box, $360.00 to Manufacturers Hanover Trust Company in repayment of a loan received in prior years which included an interest payment of $12.80, $1.98 to Snow-Proof Company, $21.75 to L. L. Bean, Inc., $11.85 to Herbert Nix, $3.95 to Carl R. Larson, $1.00 to Treasurer of the United States, $7.95 to Gander Mountain, Inc., and $3.95 to Product Masters Manufacturing Company. Some of these payments represented reimbursements made by petitioner to individuals to whom he had sold bullets *174 that had proved for some reason to be defective. Petitioner kept no records of the tips he received and no formal records of his sales and cost of sales of bullets. Petitioner on his income tax return reported as total wages received $3,750.30 and reported a loss as shown on Schedule C from business or profession, which he listed as manufacturing rifle bullets under the business name of Malter Arms Co., of $1,671.15 which arose from showing as gross receipts the amount of $175, and as cost of goods sold the amount of $600 (consisting of $100 merchandise purchased and $500 for material and supplies), and claiming a deduction for rent of $280, for interest on business indebtedness of $38,48 and for legal and professional fees of $927.67. Respondent in his notice of deficiency disallowed the business loss of $1,671.15 claimed by petitioner and increased petitioners' income by the amount of $5,625 under the designation "Income from tips." In his computation of tax, respondent allowed petitioner the standard deduction. Ultimate Facts 1. Petitioner received income from tips in the amount of $1,750 which was not reported on his income tax return for the year 1963. 2. Petitioner *175 has failed to show the cost of the manufacture of bullets which he stated were sold for $175 in 1963, has failed to show that he paid any interest on business indebtedness in 1963, and has failed to prove what amount, if any, of the rental of his apartment should be allocated to use of the apartment for the manufacture of bullets. 3. Petitioner in 1963 paid $777.67 as attorneys fees with respect to applications for patents which during that year proved to be impractical for commercial use and valueless. 4. Petitioner in 1963 paid $50 in attorneys fees in connection with the settlement of fees due to one of the firms of attorneys who had done legal work in connection with one of his patent applications. Opinion Both parties recognize that whatever amounts were received by petitioner as tips should be included in his taxable income. Petitioner contends that most of the work he did in 1963 was as a service or banquet bartender, that as a service bartender he received no tips, and as a banquet bartender whatever tips he received were included in his wages as reported. Petitioner further contends that the small amount of tips he received when he worked at a cash bar was included *176 in his taxable income in that the total income he reported on his return from wages was $3,750.30, whereas the total wages he received as a bartender in 1963, aside from tips was only $3,619.52. Petitioner says that the difference in these two amounts of slightly over $130 is in fact more than the amount of the tips he received. Respondent in his notice of deficiency does not show the method used to arrive at the total tip income of $5,625 he determined that petitioner received, but at the trial his counsel stated that this amount was arrived at on the basis that petitioner would receive tips of 150 percent of the wages he received. Apparently, respondent in making this determination used the $3,750.30 reported by petitioner on his income tax return as wages instead of the $3,619.52 of actual wages received by petitioner as shown on the W-2 forms filed by his employers showing his wages for 1963. Respondent's primary argument is that his determination is presumptively correct, and petitioner has failed to discharge the burden of showing error therein. Respondent then states that under these circumstances his determination as made on a formula basis should be sustained, citing such *177 cases as Dorothy L. Sutherland, 32 T.C. 862 (1959); Carroll F. Schroeder, 40 T.C. 30 (1963); Mendelson v. Commissioner, 305 F. 2d 518 (C.A. 7, 1962), affirming a Memorandum Opinion of this Court; and Anson v. Commissioner, 328 F. 2d 703 (C.A. 10, 1964), affirming a Memorandum Opinion of this Court. Respondent argues that the only evidence offered by petitioner was self-serving statements which have been shown to be inaccurate. Respondent then contends that since petitioner failed to keep records of the tips he actually received and has offered no evidence other than his inaccurate statements, respondent's determination should be sustained. There have been numerous cases such as some of those we have heretofore cited in which this Court and other courts have approved a formula used by respondent in computing the tip income of an individual waiter or waitress where that individual had kept no records of the tips received and his general statements based on memory were not considered sufficient to whow that respondent's determination was erroneous. However, the instant case does not fall within this factual pattern. If we completely *178 disregard the testimony of petitioner with respect to the amounts of tips he received, there still remains sufficient evidence in the record from the stipulated facts and the testimony of a witness called by respondent to show that even though the amount of tips which petitioner contends he received is grossly understated, the amount of tips received by petitioner as determined by respondent is substantially overstated. Before discussing the evidence with respect to tips received by petitioner while working at cash bars at the New York Coliseum, we will consider what tips petitioner might have received during the course of his employment by other companies as a bartender during the year 1963 and while employed as a service or banquet bartender at the Coliseum. Petitioner testified that a service bartender received a higher salary than a public or front bartender and that the reason such higher salary was paid to the service bartender was because the service bartender was not in a position to receive tips from the public. Petitioner stated that bartenders' salaries were higher than the salaries of waiters because waiters were in a position to receive greater tips than bartenders. *179 Petitioner offered in evidence a union contract which supported his statement that a service bartender's weekly wages were substantially higher than those of the public bartender and that bartenders' wages were substantially higher than the wages of waiters. Petitioner's testimony that a service bartender received higher wages than a bartender at a cash bar was likewise supported by respondent's witness who was employed at the time he testified at the trial of this case as the wine steward at the Coliseum in charge of all the public or cash bartenders as well as the service and banquet bartenders. Petitioner also stated that he did not receive tips from waiters and that the union agreement with the hotels prohibited waiter's tipping service bartenders who worked in hotels. However, petitioner did not point to any provision in the contract between the union and the hotels which he offered as an exhibit in evidence, which prohibited public bartenders or waiters from tipping service bartenders, and we have found nothing in the contract which specifically so provides. Respondent's witness testified that since he had been wine steward at the Coliseum, which employment he commenced subsequent *180 to the year 1963 although he had been working for the wine steward there in 1963, it had been customary for the cash bartenders to place an amount in a "kitty" each day to be distributed to the service bartenders. His testimony was that where there were two service bartenders, the amount might be split equally between them or distributed on some other basis determined to be equitable considering the number of hours each had worked at the service bar. He stated that currently at shows which had the highest cash bar sales and highest amount of tips the public bartenders, when 10 or 11 were working, would each put $2 a day in the "kitty" for the two service bartenders which would amount, if split equally, to approximately $10 or $11 a day for each of the service bartenders. He stated that at less lucrative shows from the standpoint of cash bar sales and tips, the amount would be proportionately less per bartender and there might be fewer cash bartenders working. The evidence also showed that work as a bartender at the Coliseum was considered by bartenders to be more lucrative than other bartending work even though the salary paid at certain other bars might be higher. From this testimony *181 we conclude that at the present time in a position considered to be a good one for a bartender, a service bartender would not receive in excess of approximately $10 per day from the "kitty" made up by the cash bartenders at a maximum and that generally the amount received by the service bartender would be substantially less than the $10 a day amount. The only place where petitioner worked during the year 1963 as to which the record shows the number of public bartenders was the Stork Restaurant, Inc. Petitioner stated that at the Stork Restaurant, Inc., there were three public bartenders and one service bartender. While the evidence introduced is far from sufficient to show accurately what amount of tips petitioner did receive, it is sufficient to show that petitioner has grossly understated the amount of these tips and that respondent's determination is greatly in excess of the amount which the evidence supports as being received by petitioner. The record also shows that for about the first 10 weeks of 1963 petitioner was working at the Coliseum and also at the Hotel Americana and for approximately the last 10 weeks of 1963 he was working at the Stork Restaurant, Inc., as well *182 as part time at the New York Coliseum. The time periods when petitioner worked for the Plaza Hotel, Inc., and Hotel Roosevelt Corp., and the one day or part of one day he worked at the Hotel Commodore, are not shown. If it is assumed that petitioner received approximately $80 a week during 1963 for his work at these various hotels, his total employment at the three hotels would have been a little over 18 weeks. Whether this assumption would be accurate or not is questionable since the testimony is that the pay at the Coliseum for a service bartender was around $16.50 a day in 1963 which was lower than the pay at the Hotel Americana. It is obvious, of course, that $16.50 for a 5-day week amounts to more than $80. In any event it would appear that other than working at the Coliseum, petitioner worked as a service bartender or possibly for some small portion of the time as a banquet bartender between 35 and 40 weeks during 1963, some of the time as heretofore pointed out duplicating times he worked at the New York Coliseum. Likewise using the salary ranges supplied by respondent's witness as being applicable to cash bartenders and service bartenders in the year 1963, it would appear *183 that petitioner worked approximately 19 days or 4 weeks as a service or banquet bartender at the New York Coliseum. Although the stipulated fact that reported wages for banquet bartenders included the tips received by them only covers banquet work done by petitioner in 1963 at the New York Hilton, Essex House Hotel, and Towers Hotel, the inference from the record is that any other wages received by petitioner as a banquet bartender would include the tips or gratuities he received in the wages shown by his employer on the form W-2. What portion of the bartender work done by petitioner in 1963 would be as a banquet bartender, the record does not show. All of petitioner's work at the Stork Restaurant, Inc., and Hotel Americana was stated by him to be as a service bartender. If petitioner had worked for 42 weeks as a service bartender and received an average of $25 a week from a "kitty" contributed by the public or cash bartenders, he would have received an amount of $1,050 from this source. Since part of his work was as a banquet bartender and since petitioner has not produced records to show this amount, but merely very general testimony, we conclude that petitioner received approximately *184 $880 in addition to his reported wages for work as a service bartender. Respondent computed an amount of $1,300 as having been received by petitioner for work as a cash or public bartender at the Coliseum, stated to be based on the testimony of his witness. In so doing, respondent used the top estimate of percentage of tips to cash received for each show as given by this witness and adjusted only for relief at a lunch hour whereas before concluding his testimony the witness stated that where the show remained open for 10 to 12 hours, normally one bartender would only work 8 hours spread over a 9-hour period with one hour for lunch, and therefore a relief bartender would work more than one hour of the time the bar was open. The witness stated that a further adjustment should have been made to his estimates as to the amount of cash petitioner would have taken in while working at the cash bars for these additional reliefs. Also, from the testimony of respondent's witness it would seem probable that petitioner would put some part of the tips he received in a "kitty" for the service bartenders. For these reasons we consider that respondent's computation overstates the amount of petitioner's *185 tips as a cash bartender based on the opinion given by his witness. We conclude from the testimony of respondent's witness based on records maintained in the normal course of business by Harry M. Stevens, Inc., the operators of the bar facilities at the New York Coliseum that petitioner received approximately $1,000 as tips while working at the cash bars at the New York Coliseum during the year 1963. Petitioner argues that we should not accept the records of the Coliseum since they do not show in detail the names of relief bartenders or precisely the number of hours worked by petitioner at the cash bar. He also contends that since the witness who now has custody of the records was not the same individual who kept the records in 1963 the records should not have been received in evidence. Petitioner made no objection to receipt of the records when they were offered at the trial even though afforded an opportunity to do so. He specifically stated that he had no objection to their receipt. The records of the sales at the Coliseum were identified as being records kept in the ordinary course of the business of Harry M. Stevens, Inc., and as such are proper to be received in evidence. *186 Anson v. Commissioner, supra. Also, we conclude from the testimony of the witness who produced these records that he, both from his work in another capacity at the Coliseum during 1963 and his general experience in the business of operating bars, was competent to express an opinion of the amount of the cash receipts at any bar which would probably have been taken in by one bartender as compared to another and the probable tips which would be received with respect to those cash sales. This witness, himself, of course, stressed that his estimate was "a very rough estimate," explaining that some shows were better than others, both as to sales and tips. He stated, "Some shows you sell more liquor and less beers. Other shows, big beer shows you don't receive as much in tips." His overall estimate was that for the shows as a whole, a cash bartender would receive between 5 and 10 percent of the cash taken in as tips and as we have set forth in our findings he broke it down by various shows at which petitioner worked. In this state of the record we consider the best available evidence to be this witness's opinion and have accepted it, applying to his testimony our interpretation *187 of the ultimate estimate he made of tips which petitioner would have received. We therefore conclude that petitioner received approximately $1,880 in tips or gratuities in 1963 other than as a banquet bartender. Since he reported only a little over $130 as wages in excess of the wages shown on the W-2 forms furnished by his employers, we have found that petitioner received $1,750 in tips in addition to the amount reported by him on his income tax return and so hold. We recited in our findings numerous expenditures made by petitioner in the year 1963, to which the parties stipulated. Respondent argues that the amount of these expenditures supports his contention that petitioner must have received substantially more income than he reported in 1963 to have made these expenditures and supported his family. However, the evidence shows that petitioner received some amount of unemployment compensation in 1963 although the amount is not shown. Also, petitioner stated that in that year he borrowed $1,000 from his parents and sold some of the furnishings from his home to get extra funds. We have also found that petitioner did receive some income in addition to that he reported. We therefore *188 are not persuaded that from petitioner's expenditures in 1963, he received unreported taxable income in excess of the $1,750 of tip income we have found to have been omitted from his reported income. The next issue concerns petitioner's claimed loss from the operation of the business of Malter Arms Co. Respondent argues that petitioner's activities were not sufficient to constitute a business, that if it were a business, petitioner had abandoned that business in 1963, and that since petitioner had always been interested in guns and shooting, his activity in manufacturing husk bullets was more in the nature of a hobby. While we do not consider petitioner's activity in connection with the making of the husk bullets to be a hobby activity, the record does indicate that petitioner was discontinuing this activity in 1963. However, from the record we conclude that petitioner did enter into the making of the husk bullets and attempted to acquire patents covering their manufacture in an effort to and with the reasonable expectation of making a profit. The evidence shows that one patent application had been for all practical purposes abandoned and the other, though later a patent was issued, *189 had been shown to be impracticable before the end of the year 1963. Since petitioner has failed to show that he had deductible expenses (without consideration of the attorneys fees he paid) in connection with the manufacture of the husk bullets in excess of the $175 he showed on his income tax return as received from sales, and since in our opinion the attorneys fees paid by petitioner are deductible as a loss in 1963 on a transaction entered into for profit, we do not consider it necessary to decide whether petitioner's activities in manufacturing husk bullets constituted carrying on a trade or business. Petitioner stated that he estimated the $100 he deducted on his return for merchandise purchased and the $500 deducted for material and supplies. He has produced no evidence to support these estimates. The facts show that the deduction petitioner claimed for interest on business indebtedness is erroneous. Petitioner testified that any work done by him with respect to the manufacture of the bullets was done in his apartment. However, there is not sufficient evidence in the record to permit an allocation of such a portion of the rent of his apartment to this activity to cause petitioner *190 to have deductible expenses in connection therewith in 1963 in an amount in excess of $175. In our opinion petitioner is entitled to deduct the $827.67 which he paid as attorneys' fees in 1963 as a loss from a transaction entered into for profit. All but $50 of this amount was paid in connection with patents which by the end of that year had become valueless and the $50 was paid in connection with adjusting one of the other attorneys' fees and should be considered as in the same nature as that fee. See Katherine Ander, 47 T.C. 592 (Mar. 16, 1967). Respondent argues that the attorneys' fees paid by petitioner in 1963 were capital expenditures and would have to be recovered over the useful life of the patent. However, the evidence shows that the patents had no useful life in 1963. They were worthless in that year and for this reason we hold that petitioner is entitled to deduct the $827.67 paid as attorneys' fees in the year 1963. J. Weingarten, Inc., 44 B.T.A. 798 (1941), and Charles T. Parker, 1 T.C. 709 (1943). We recognize that the measure of petitioner's loss might well include the expenditures he made in years prior to 1963 as well *191 as those made in 1963. However, the only evidence as to the amounts of those payments is a copy of a letter and statement from one of the attorneys to whom petitioner made a payment in 1963 which refers to certain prior payments. There is no showing of whether petitioner had elected to expense these payments in the prior years instead of considering them as capital expenditures. In this state of the record, the only amount which is shown to be a loss in 1963 is the $827.67 of attorneys' fees paid by petitioner in that year. The final issue is the correctness of respondent's determination of addition to tax under section 6653(a) of the Internal Revenue Code of 1954 because of petitioner's negligent or intentional disregard of rules and regulations. The record shows that petitioner kept no records either of his tip income or of his operations in connection with Malter Arms Co. Petitioner offered no explanation or justification for his failure to keep the required records, and therefore, has failed to show error in respondent's determination of an addition to tax for negligence. Dorothy L. Sutherland, supra.
Decision will be entered under Rule *192 50.